IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| WILLIAM BROWN, | § | |
| Petitioner, | § | |
| | § | |
| V. | § | Civil Action No. 4:20-CV-1156-O |
| | § | |
| BOBBY LUMPKIN, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

**OPINION AND ORDER**

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner, William Brown, a state prisoner confined in the Correctional Institutions Division of the Texas Department of Criminal Justice, against Bobby Lumpkin, director of that division, Respondent. After considering the pleadings and relief sought by Petitioner, the Court has concluded that the petition should be denied.

## I. BACKGROUND

In 2015 in Tarrant County, Texas, Case No. 1422674D, Petitioner was charged with murdering Andre Fobbs. Clerk's R. 6–7, ECF No. 19-17. The indictment alleged that Petitioner on or about July 10, 2015, did

> then and there commit or attempt to commit an act clearly dangerous to human life, namely, shooting Andre Fobbs with a deadly weapon, to-wit: a firearm, which caused the death of Andre Fobbs, and the said defendant was then and there in the course of or immediate flight from the commission or attempted commission of a felony, to-wit: unlawful possession of a firearm by a felon,
>
> PARAGRAPH TWO: . . . then and there intentionally or knowingly cause the death of an individual, Andrew Fobbs by shooting him with a firearm,'
>
> PARAGRAPH THREE: . . . then and there intentionally, with the intent to cause

serious bodily injury to Andrew Fobbs, commit an act clearly dangerous to human life, namely, shooting Andre Fobbs with a firearm, which caused the death of Andre Fobbs.

. . .

Clerk's R. 6 ECF No. 19-17.

The indictment also included a habitual-offender notice, alleging two prior sequential felony convictions. *Id.* Following a jury trial, the jury found Petitioner guilty of murder as charged in the indictment, found the habitual-offender notice true, and assessed his punishment at life imprisonment. *Id.* at 116, 126, 128. Petitioner's conviction was affirmed on appeal and the Texas Court of Criminal Appeals refused his petition for discretionary review. Electronic R., ECF No. 19-1. Petitioner also challenged his conviction in a post-conviction state habeas-corpus application, which was denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court and its own independent review of the record. Action Taken, ECF No. 19-23.

In its appellate brief, the state summarized the evidence adduced at trial as follows (any spelling, punctuation, and/or grammatical errors are in the original):

*Guilt/Innocence Phase:*

On July 10, 2015, a number of people gathered at Andre Fobbs' house, including [Petitioner]. Mr. Fobbs and [Petitioner] got into an argument over money which lasted between thirty minutes and an hour. Mr. Fobbs remained calm during this argument, and did not touch or threaten to harm [Petitioner]. [Petitioner], however, became increasingly angrier, and eventually pulled out a gun and shot Mr. Fobbs three times. Mr. Fobbs ran inside the house where he collapsed from severe blood loss.

[Petitioner] walked over to Danny Dorsey's car and, with a gun sitting in his lap, told Mr. Dorsey to "get me the f--k away from here". Mr. Dorsey drove [Petitioner] to the back of a nearby apartment complex. As he exited the car, [Petitioner] said that he knew the other people at the house would tell the police. [Petitioner] did not mention Mr. Fobbs having a gun or threatening him.

2

At Mr. Fobbs' house, the police followed a blood trail from his front door to his bedroom. Officer Daniel Karna began administering first aid. Mr. Fobbs was lying on his back amidst a large pool of blood that was spurting from his neck. He was engaged in agonal breathing—a deep gulping common to situations where someone is dying. Officer Karna placed a bandage on Mr. Fobbs' neck and applied pressure. He soon discovered another entry wound on the other side that also needed treatment. Officer Karna's treatment was met with limited success.

Paramedic Steven Steffgen found Mr. Fobbs in a dire condition. He was lying supine on the floor with massive blood loss due to multiple gunshot wounds. His pulse was fast, but weak, and his eyes were looking, but not seeing. Mr. Fobbs was agonally breathing and could not respond to any commands. He died while on route to JPS Hospital.

On July 23, 2015, [Petitioner] called his former girlfriend, Veronica Wyatt, to pick him up from a Detroit bus station. He had traveled by Greyhound Bus from Dallas to Detroit via Memphis and Cincinnati. [Petitioner] told Ms. Wyatt that he left Texas because he shot a guy in the head and chest in a dispute over drugs. He hid a black gun in Ms. Wyatt's closet. The next day, Ms. Wyatt contacted local law enforcement.

Michigan law enforcement found [Petitioner] sleeping on Ms. Wyatt's living room couch, and handcuffed him before he fully awoke. [Petitioner] admitted that he had "messed up", but did not provide any details. The police found two weapons, including a 9mm pistol, on an upper shelf in the bedroom closet. They shipped the guns, along with ammunition and a magazine found with [Petitioner]'s belongings back to Texas.

Firearms examiner Paul Slocum compared [Petitioner]'s 9 mm with bullets recovered from Mr. Fobbs' body and shell casings found near his front porch. He determined that the bullets and the shell casings were consistent with being fired from [Petitioner]'s 9 mm pistol.

Dr. Richard Fries conducted an autopsy on Mr. Fobbs, and determined that he suffered three gunshot wounds to his jaw, chest and back, which caused extensive internal injuries. He described the jaw (#1) and chest (#2) gunshot wounds as life-threatening due to the significant blood loss they caused. . . . [and] determined that Mr. Fobbs died from these gunshot wounds . . . . [He also explained that "strippling" is the "unburnt or burning fragments of gunpowder that hit the skin and will embed themselves in it" when shot at an intermediate range—between one to 3 feet. He observed that stippling was evident in one of Fobbs' gunshot wounds.]

[Gunshot residue expert Vickie Hall received gunshot residue samples, or

3

"stubs," for analysis from three areas of Danny Dorsey's Mercury and from the backs and palms of Fobbs' hands. Her analysis revealed particles consistent with gunshot residue on the passenger side dash of the Mercury and particles characteristic of gunshot residue on the back and palm of Fobb's right hand. According to Hall,

> [a] person can have gunshot residue on either their hands or their person by either discharging a firearm, or being in close proximity to a discharging firearm, or possibly handling a firearm or a firearm component or some other surface that has gunshot residue on it.

She agreed that if Fobbs had "strippling" around one of his gunshot wounds, which indicates that he was shot at close range, it would not be unusual that he had gunshot residue on him. According to Hall, strippling would occur between three and 4 feet from the end of the barrel of the gun.]

[Petitioner, who testified on his own behalf, asserted that he shot Fobbs in self-defense. According to Petitioner, the house Fobbs shared with Christopher Anderson was a "trap house" and Anderson was going to "put [Fobbs] out" for stealing. Petitioner and Fobbs were friends and Petitioner had offered to let Fobbs stay with him when he moved into an apartment. On the day of the shooting, the two were arguing because Petitioner had loaned Fobbs money and rather than repay him, Fobbs lied about being robbed. After the lie was revealed, Petitioner told Fobbs that he was "on his own," and, as he was leaving the house, Fobbs struck him on the back of his head with a revolver from behind. Petitioner then turned around and shot Fobbs in fear that Fobbs was going to rob or kill him. Petitioner picked up Fobbs's revolver, which was seized with Petitioner's 9 mm pistol, and fled.]

[Finally, Fort Worth police officer Christopher Wells, with the gang unit since 2001, confirmed that, although Petitioner was not a documented gang member, Petitioner's Facebook site used a writing style and Petitioner's tattoos were indicative of gang membership.]

*Punishment Phase:*

[Petitioner] physically abused Veronica Wyatt during their two-year dating relationship. One time, when upset that Ms. Wyatt had not been home when he was looking for her, [Petitioner] came up behind her and hit her in the back of the head. Later that day, when she tried to leave the house, [Petitioner] blocked her way and punched her in the jaw causing it to become dislocated.

[Petitioner] has an extensive criminal history of three felony convictions—two convictions for assault causing bodily injury to a family member and one conviction for burglary of a habitation—and five misdemeanor convictions—three

4

convictions for possession of marijuana, one conviction for assault causing bodily injury to a family member, and one conviction for evading arrest.

States's Br. 2–6, ECF No. 19-19 (record citations omitted).

At the close of the guilt/innocence phase of trial, the trial court included jury instructions on self-defense and an instruction under § 46.02 of the Texas Penal Code that the use of force against another in self-defense is not justified if the actor sought an explanation from or discussion with the other person concerning the actor's differences with the other person while the actor was carrying a weapon unlawfully. TEX. PENAL CODE §§ 9.31(b)(5)(A), 46.02 (West, Westlaw through legislation eff. June 18, 2021, of the 2021 Legis. Sess.).

## II. ISSUES

Petitioner raises the following claims for relief:

(1)   "actual innocence-miscarriage of justice" based on newly discovered evidence of coercion of state eyewitnesses to testify falsely (ground one);

(2)   ineffective assistance of trial and appellate counsel (grounds two, three, and six);

(3)   prosecutorial misconduct (ground four); and

(4)   destruction of evidence (ground five).

Pet. 6-7,[1] 11, ECF No. 1. Petitioner's claims are multifarious and addressed as thoroughly as practicable below.

## III. RULE 5 STATEMENT

Respondent believes that Petitioner has exhausted his state-court remedies as to the claims raised and that the petition is neither successive nor time-barred. Resp't's Answer 6, ECF No. 17.

---

[1]Because pages are added to the form petition, the pagination in the ECF header is used.

## IV.  DISCUSSION

### A.  Standard of Review

A § 2254 habeas petition is governed by the heightened standard of review provided for by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)–(2); *Harrington v. Richter,* 562 U.S. 86, 100–01 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. It is the petitioner's burden to rebut this presumption by clear and convincing evidence. *Id.*

Further, when the most recent state court to consider a constitutional issue provides a "reasoned opinion," a federal habeas-corpus court must "review[ ] the specific reasons given by the state court and defer[ ] to those reasons if they are reasonable." *Wilson v. Sellers,* — U.S. —, 138 S. Ct. 1188, 1191-92 (2018). Under those circumstances, a federal court should "'look through' the unexplained decision to the last related state-court decision providing" particular reasons, both legal and factual, "presume that the unexplained decision adopted the same reasoning," and give appropriate deference to that decision. *Id.* In other words, federal habeas-corpus courts confronted with an unexplained state-court decision "are to 'look through' the decision to an earlier state court

6

opinion and presume that the earlier one provides the relevant rationale." *Thomas v. Vannoy,* 898 F.3d 561, 568 (5th Cir. 2018) (citing *Sellers,* 138 S. Ct. at 1192).

Petitioner has not brought forth clear and convincing evidence to rebut the state courts' factual findings relevant to the issues raised. Therefore, the Court defers to all relevant state-court findings of fact in the discussion below.

### B.  Actual Innocence Based on Newly Discovered Evidence

Under his first ground, Petitioner claims "actual innocence-miscarriage of justice" based on newly discovered evidence that the prosecutors intentionally and knowingly used false and fabricated testimony during his trial and suppressed evidence that Fobbs had gunshot residue on his hands. Pet. 6, ECF No. 1. More specifically, in his state habeas application, he claimed that the state "employed" eyewitnesses to testify that they did not see Fobbs point a gun and shoot at Petitioner or Petitioner shoot Fobbs in self-defense by using drugs and other evidence seized from the house as leverage against them and knew that gunshot residue was found on Fobbs and suppressed by Amanda Schaffner of the Fort Worth crime lab. SHR[2] 18–19, ECF No. 19-26.

A claim of actual innocence based on newly discovered evidence is not cognizable on federal habeas review. *See Herrera v. Collins,* 506 U.S. 390, 400 (1993); *Graves v. Cockrell,* 351 F.3d 143, 151 (5th Cir. 2003). In fact, the Supreme Court reaffirmed in *McQuiggin v. Perkins,* 569 U.S. 383, 392 (2013), that it has not yet resolved whether a prisoner may be entitled to habeas-corpus relief based on a freestanding claim of actual innocence. Until that time, such a claim it not cognizable on federal habeas review under Fifth Circuit law. *In re Swearingen,* 556 F.3d 344, 348 (5th Cir. 2009). To the extent Petitioner's asserts that his actual-innocence claim is "intertwined" with his claim of

---

[2]"SHR" refers to the record of Petitioner's habeas proceeding in WR-91,225-01.

manifest injustice based on prosecutorial misconduct, his claims of prosecutorial misconduct are addressed separately in this opinion, *see infra*. Pet'r's Traverse 1, ECF No. 31.

### C. Ineffective Assistance of Counsel

Under his second, third, and sixth grounds, Petitioner claims that he was denied his right to effective assistance of counsel at trial and on appeal. A criminal defendant has a constitutional right to the effective assistance of counsel at trial and on a first appeal as of right. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey*, 469 U.S. 387, 393–95 (1985); *Strickland*, 466 U.S. 668, 688 (1984); *Anders v. California*, 386 U.S. 738, 744 (1967). *See also Styron v. Johnson,* 262 F.3d 438, 450 (5th Cir. 2001) (applying the *Strickland* standard to ineffective-assistance claims against appellate counsel). An ineffective-assistance claim is governed by the familiar standard set forth in *Strickland v. Washington*. 466 U.S. at 668. To establish ineffective assistance of counsel under this standard, a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Id.* Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697.

In applying this standard, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial or appellate strategy. *Id*. at 668, 688–89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689. Where a petitioner's ineffective-assistance-of-counsel claims have been reviewed on their merits and denied by the state courts, federal habeas relief will be granted only if the state courts' decision was contrary to or involved an unreasonable application of the *Strickland* standard in light of the state-court record.

*Richter,* 562 U.S. at 100–01 (quoting *Williams,* 529 U.S. at 410); *Bell v. Cone*, 535 U.S. 685, 698–99 (2002). Thus, a federal court's review of state-court decisions regarding ineffective assistance of counsel must be "doubly deferential" so as to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow,* 571 U.S. 12, 15 (2013) (quoting *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011)).

Under grounds two and three, in part, Petitioner claims trial counsel Danny D. Pitzer was ineffective by failing to investigate or present forensic expert testimony regarding "gun residue" to resolve conflicts in Hall's and Dr. Fries's testimonies regarding "the 'proximity' of the stippling [sic] found around [Fobbs]'s right hand, his injuries and the gun residue found around the (2) bullet holes found in the front dash" of the Mercury and to support his "self-defense claim, that [Petitioner] acted in self defense only after being shot at (2) times from [Fobbs]." Pet. 6, ECF No. 1. In an affidavit filed in the state habeas proceedings, counsel, who recorded over 97 hours of time spent on Petitioner's case, explained that the State's expert established that there was gunshot residue found on Fobbs and to hire another expert would have been duplicitous; thus, it was a "trial tactic decision." SHR 111, ECF No. 19-26. He explained that the only evidence that Fobbs fired at Petitioner was Petitioner's testimony, that there was no gun recovered at the scene and no bullets or casings found, and that no expert could have bolstered Petitioner's testimony that Fobbs had a gun. *Id.* He further explained that shots in the dash of the Mercury were not relevant to the issues in the case as the shooting of the victim did not occur in a vehicle. *Id.*

Based on the record and counsel's affidavit, the state habeas court adopted the following relevant findings of fact regarding the claims:

68. [Petitioner] presents no credible evidence to support his claim that Mr. Pitzer

failed to investigate this case.

69. [Petitioner] presents no credible evidence to support his claim that counsel failed to prepare for trial.

70. [Petitioner] presents no evidence, or a name, of an expert who would have testified beneficially regarding gunshot residue.

71. [Petitioner] presents no evidence, or a name, of an expert who would have testified beneficially regarding bullets and guns.

72. Mr. Pitzer did not present an expert to testify regarding gunshot residue because evidence at trial demonstrated that the victim had gunshot residue on his right hand.

73. Mr. Pitzer, through questioning, demonstrated that gunshot residue is only expelled "three to 4 [sic] feet from the barrel or 18 to 24 inches to the side of the firearm."

74. Further testimony at trial was that gunshot residue only travels "up to two to 3 [sic] feet" with "most handguns."

75. There is no evidence that an expert would have testified that the gunshot residue on the victim's hands meant the victim fired a gun.

76. [Petitioner] presents no evidence, or specific facts, that the State's evidence that his gun matched the bullets fired at the scene was faulty or impeachable.

77. There is no evidence that Mr. Pitzer should have presented expert testimony regarding gunshot residue, bullets, and/or guns.

. . .

82. [Petitioner] argues that counsel should have emphasized the evidence that the dash of the vehicle outside had two bullet holes in it which supported [Petitioner]'s self-defense claim.

83. The victim was shot in the front yard.

84. [Petitioner] presents no evidence, or citation to the record, to support his claim that there were bullet holes in a vehicle.

85. The several spots inside the Mercury tested positive for gunshot residue.

86.     Testimony at trial demonstrated that the gunshot residue in the Mercury could have been the result of touch transfer.

87.     [Petitioner] testified that the victim hit him with a gun and that he was afraid the victim might shoot him; [Petitioner] did not testify that the victim did shoot at him.

88.     There is no evidence that bullet holes were found inside the Mercury vehicle.

*Id.* at 131–32 (record citations omitted).

Based on its factual findings, and applying the *Strickland* standard, the state habeas court adopted the following legal conclusions regarding the claims:

48.     [Petitioner] has failed to prove that counsel's investigation fell below an objective standard of reasonableness.

49.     [Petitioner] has failed to prove that counsel's decision to not present expert testimony constituted deficient representation.

50.     [Petitioner] has failed to prove that counsel did not properly prepare for trial.

51.     [Petitioner] has failed to prove that counsel failed to investigate the law and the facts in this case.

. . .

61.     [Petitioner] has failed to show that a reasonable likelihood exists that the outcome of the proceeding would have been different had counsel investigated more.

62.     [Petitioner] has failed to show that a reasonable likelihood exists that the outcome of the proceeding would have been different had counsel presented more evidence.

. . .

74.     [Petitioner] has failed to prove that he received ineffective assistance of trial counsel.

*Id.* at 143–46 (citations omitted).

11

Deferring to the state court's factual findings, the state court's application of *Strickland* is not objectively unreasonable under the doubly-deferential standard. "Informed strategic decisions by counsel are given a heavy measure of deference and should not be second guessed." *United States v. Jones,* 287 F.3d 325, 331 (5th Cir. 2002). Furthermore, Petitioner failed to demonstrate what a more thorough investigation would have revealed and how it would have altered the outcome of his trial. *Gregory v. Thaler,* 601 F.3d 347, 352 (5th Cir. 2016) (providing a petitioner "who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial"). And, to show the prejudice required to support an ineffective-assistance claim premised on the failure to call a witness, a petitioner must show that the witness was available and would in fact have testified at trial in a manner beneficial to the defense. *Evans v. Cockrell,* 285 F.2d 370, 377 (5th Cir. 2002). This showing is required for claims regarding both uncalled lay and expert witnesses alike. *See Day v. Quarterman,* 566 F.3d 527, 538 (5th Cir. 2009). Petitioner failed to identify a forensic expert in state court or submit an affidavit or other evidence that the expert would have been willing to testify on his behalf and that their testimony would have been favorable to his defense. His failure to do so is fatal to the claim.

Under the remainder of his third ground, Petitioner claims that trial counsel was ineffective by improperly stating that "[n]ot guilty does not mean a person is innocent" during voir dire; failing to object to error in the jury charge on guilt/innocence; making prejudicial remarks during closing argument regarding Petitioner's gang membership; and failing to object to the state leading a witness as to whether the witness saw an outline of a gun in Petitioner's pocket. Pet. 6–7, ECF No. 1. As to these claims, counsel responded as follows (any spelling, grammatical, or punctuation errors are in

the original):

>**Complaint three:** [Petitioner] complains that I told the jury that "not guilty" does not mean that a person is innocent. I don't have the record in front of me, but I would have said that for the Jury to find [Petitioner] not guilty would not require proof that he was innocent, but rather that there were other factors to consider, such as his testimony that he acted in self defense, and/or that the state had failed to prove all elements of. its case beyond a reasonable doubt.

>The decisions I would have made at the time would have been tactical decisions intended to benefit my client.

>. . .

>[Petitioner] complains that I failed to object to the Court's charge with regard to a firearm. I did not object to the Court's charge because it was properly stated and was not objectionable. The Court **did** give instructions regarding possession of a firearm, and also gave instructions and a charge regarding self defense..

>If . . . I referred to him as a gang member, I would likely have said that being a gang member does not make you guilty of a specific crime. . . .

>As to failing to object and request a mistrial because a witness stated that he saw a gun and/or outline of a gun in [Petitioner]'s pocket would be as follows: the testimony probably was not objectionable, but as a trial tactic, many times the decision is do you call the Juror's further attention to the testimony when they are going to get the answer eventually or just let it be. That is a decision to be made on the spur of the moment, and is a trial tactic.

>. . .

SHR 111–13, ECF No. 19-26.

Based on the record and counsel's affidavit, the state habeas court adopted the following

relevant findings of fact regarding the claims:

>78.    Mr. Pitzer argued, during closing argument, as follows:

>>And I'll submit to you that the evidence that you've heard in this case, all of the evidence when you look at it, as we talked about on voir dire, *a not guilty verdict doesn't mean somebody is innocent. What is* [sic] *means is the State has*

> *simply failed to prove all the elements they've got to prove beyond a reasonable doubt that [Petitioner] was not acting in self-defense.* And I'd ask you to find your verdict of not guilty.

79.  [Petitioner] testified that he had a gun and committed the offense.

80.  Mr. Pitzer made the argument that not guilty does not mean innocent because [Petitioner] testified that he acted in self-defense, which included admitting that he committed the offense.

81.  Mr. Pitzer's closing argument was the result of reasonable trial strategy.

. . .

89.  The jury instruction stated, in part, as follows:

> . . .

> While the defendant has the right to seek an explanation from or discussion with another concerning differences with the other person, the use of force against another is not justified if the defendant sought an explanation from or discussion with another concerning differences with the other person while the defendant was carrying a weapon in violation of 46.02 of the Texas Penal Code.

> A person commits the offense of unlawfully carrying weapons in violation of 46.02 of the Texas Penal Code if he intentionally, knowingly or recklessly carries on or about his person a handgun.

> Now therefore, if you find and believe from the evidence beyond a reasonable doubt that the force used by the defendant against Andre Fobbs, was at the time the defendant was seeking an explanation from or discussion with Andre Fobbs, if he was, concerning the defendant's differences with Andre Fobbs, but at that time the defendant was unlawfully carrying a weapon to wit: a handgun, you will find against the defendant's claim of self-defense.

> . . .

14

90.     The jury charge did not include the additional requirements of section 46.02 of the Texas Penal Code like prohibited location, prohibited activity, or generally, that [Petitioner] was a person prohibited from possessing.

91.     Mr. Pitzer did not object to the jury instruction regarding unlawful possession of a firearm because he concluded it was proper.

92.     It is reasonable that, had Mr. Pitzer objected, the trial court would have included the additional language in the jury charge.

93.     The judgment and sentence of [Petitioner]'s prior felony conviction for burglary of a habitation was admitted at trial.

94.     [Petitioner] testified that he was a convicted felon.  [6 RR 187]

95.     The fact that [Petitioner] was unlawfully possessing a firearm was an element of Count I, Paragraph I.

96.     To find that [Petitioner] was guilty under Count I, Paragraph I, the jury had to find that [Petitioner] was unlawfully possessing the firearm.

97.     The State did not elect a specific paragraph.

98.     The jury found [Petitioner] guilty "as alleged in the indictment."

99.     The offense occurred "in the front yard" of someone else's home.

100.    After the shooting, [Petitioner] got into Danny Dorsey's car.

101.    There is no reasonable likelihood that the outcome of the proceeding would have been different had counsel objected to the jury charge's instruction regarding article 46.02 of the Texas Penal Code.

102.    Mr. Pitzer argued as follows during closing argument:

> The State has no direct evidence, no direct evidence of [Petitioner] murdering Andre Fobbs rather than [Petitioner] himself, as he told you he was doing. Much was made in the questioning about, well, why would he run to Detroit?  Why run off? Why not just tell the police officer? Well, if you'll remember the voir dire, we had a fellow venireman who had been in the Boy Scouts - - head of the Boy Scouts for 30 years who said, Justice isn't the same for a black person.  *And I'll*

15

> *submit to you, it's a reasonable deduction from the evidence*
> *you've seen in this case, had [Petitioner] gone up to any*
> *police officer with his color of skin, with his gang affiliation*
> *membership, with his criminal history, nobody would have*
> *even taken two seconds to listen [to] anything he said, just*
> *like is happening in his courtroom from what the prosecutor*
> *told you.*

103.   There was evidence at trial that [Petitioner] admitted he was a member of the Westside Rollin 60s gang.

104.   Expert testimony at trial established that, while [Petitioner] was "not currently documented" as a gang member by law enforcement, [Petitioner]'s actions and tattoos were indicative of membership in the Rollin 60s Crips.

105.   Mr. Pitzer's closing argument that [Petitioner] did not go to the police, in part, because they would think him a gang member was the result of reasonable trial strategy.

       . . .

108.   Mr. Pitzer did not object to the testimony that the witness saw a gun and/or outline of the gun in [Petitioner]'s pocket because such evidence was not objectionable.

109.   Mr. Pitzer did not object to the State's leading question regarding seeing the outline of the gun in [Petitioner]'s pocket because, even if sustained, the State would simply re-ask the question and the objection would have only called the jury's further attention to the testimony once the answer was finally given.

110.   Mr. Pitzer's decision to not bring attention to the testimony that [Petitioner] had a gun was the result of reasonable trial strategy.

111.   [Petitioner] testified he had a gun.

112.   There is no reasonable likelihood that the outcome of the proceeding would have been different had counsel objected to testimony that a witness saw [Petitioner] with a gun because [Petitioner] himself testified he had a gun and committed the offense.

113.   During closing argument at punishment, the State argued as follows:

       > In 2012, you guys can take this back with you and look. This was

16

originally a sexual assault case, because he forced [J.C.] - - by use of force, he forced her physically to have sex with him. He raped her. That's what he did. That's who he is. And he didn't stop there because he wasn't done. And he continued this behavior all the way up until July 2015.

. . .

Do you think you were going to have to hear about somebody that rapes women?

114.     The State did not refer to [Petitioner] as "a rapist."

115.     The State's comments that [Petitioner] raped J.C. was a summation of the evidence.

116.     It is reasonable that Mr. Pitzer did not object to the State's summation of the evidence because (1) the evidence was already admitted and (2) he did not want to bring any more attention to the State's argument than necessary.

117.     There is no credible evidence to support [Petitioner]'s claim that Mr. Pitzer did not provide an adequate defense.

118.     Mr. Pitzer's affidavit is credible and supported by the record.

119.     There is no credible evidence that the outcome of the proceeding would have been different but for the alleged misconduct of trial counsel.

*Id.* at 131–36 (record citations omitted).

Based on its factual findings, and applying the *Strickland* standard, the state habeas court adopted the following legal conclusions regarding the claims:

52.     Counsel's closing argument regarding not guilty and innocence was the result of reasonable trial strategy.

53.     [Under Texas Penal Code § 9.31]"(b) The use of force against another is not justified . . . (5) if the actor sought an explanation from or discussion with the other person concerning the actor's differences with the other person while the actor was: . . . (A) carrying a weapon in violation of Section 46.02."

54.     The jury instruction properly advised the jury to reject [Petitioner]'s self-

17

defense if it found that [Petitioner] was unlawfully carrying a weapon.

. . .

56.  Counsel's closing argument regarding the fact that [Petitioner] would not have been believed if he came forward on his own, because he would be thought a gang member, was the result of reasonable trial strategy.

. . .

58.  [Petitioner] has failed to prove that counsel should have objected to the State's questions and arguments.

. . .

63.  [Petitioner] has failed to show that a reasonable likelihood exists that the outcome of the proceeding would have been different had counsel argued differently.

. . .

65.  [Petitioner] has failed to show that a reasonable likelihood exists that the outcome of the proceeding would have been different had counsel objected to the State's questions more.

66.  [Petitioner] has failed to show that a reasonable likelihood exists that the outcome of the proceeding would have been different had counsel objected to the State's arguments.

67.  Pursuant to the applicable article 46.02 of the Texas Penal Code, it is unlawful to "intentionally, knowingly, or recklessly" carry a handgun "at any time" if the person is "prohibited by law from possessing a firearm."

68.  It is illegal for a felon to possess a firearm "at any location other than the premises at which the person lives."

69.  Because there was evidence presented at trial that [Petitioner] was a felon who was prohibited from carrying a firearm away from his home, [Petitioner] has failed to show that a reasonable likelihood exists that the outcome of the proceeding would have been different had counsel objected to the Article 46.02 instruction.

70.  Pursuant to the applicable article 46.02 of the Texas Penal Code, it is

unlawful to carry a handgun (1) away from one's home or (2) inside or "directly en route" to one's motor vehicle or watercraft.

71.   Because there was evidence presented at trial that [Petitioner] unlawfully carried a handgun while (1) not at his home and (2) not inside or en route to his vehicle, [Petitioner] has failed to show that a reasonable likelihood exists that the outcome of the proceeding would have been different had counsel objected to the Article 46.02 instruction.

72.   [Petitioner] has failed to show that a reasonable likelihood exists that the outcome of the proceeding would have been different had counsel objected to the Article 46.02 jury instruction.

73.   [Petitioner] has failed to show that there is a reasonable probability that, but for the alleged acts of misconduct, the outcome of the proceeding would have been different.

74.   [Petitioner] has failed to prove that he received ineffective assistance of trial counsel.

*Id.* at 142–46 (citations omitted).

Deferring to the state court's factual findings, the state habeas court's application of *Strickland* is not objectively unreasonable under the doubly-deferential standard. Petitioner's claims involve matters of state law determined adversely to him, involve strategic and tactical decisions made by counsel, or would have required counsel to make frivolous objections or arguments, all of which generally do not entitle a state petitioner to federal habeas relief. *See, e.g., Strickland,* 460 U.S. at 689 (holding strategic decisions by counsel are virtually unchallengeable and generally do not provide a basis for postconviction relief on the grounds of ineffective assistance of counsel); *Paredes v. Quarterman,* 574 F.3d 281, 291 (5th Cir. 2009) (providing counsel's failure to object to a matter of state law determined adversely to the petitioner by the state court cannot support an ineffective-assistance claim); *Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir. 2002) (concluding that counsel is not required to make futile motions or objections). And, as recognized by the state

court, even if Petitioner could establish one or more instances of ineffective assistance on trial counsel's part, he failed to demonstrate a reasonable probability that, but for counsel's acts or omissions, he would have been acquitted or his sentence would have been significantly less harsh. *See Paredes,* 574 F.3d at 291 (providing error that is harmless as a matter of state law is insufficient to satisfy *Strickland*'s prejudice prong).

Under his sixth ground, Petitioner claims he was denied effective assistance of appellate counsel because counsel failed to raise a claim of ineffective assistance of trial counsel on the basis that trial counsel failed to object to the improper jury instruction that the jury find him guilty of murder if he unlawfully carried a firearm and to raise an insufficiency-of-the-evidence claim regarding the issue. Pet. 11, ECF No. 1; Pet'r's Suppl. 9,[3] ECF No. 30. The state habeas court adopted the following relevant findings of fact regarding the claims:

123.    [Petitioner] does not allege how the appellate record is sufficient to explain why trial counsel did not make additional objections to the jury instruction.

124.    There is no evidence that the appellate record was sufficient to litigate whether trial counsel provided ineffective assistance of counsel.

. . .

126.    [Petitioner] presents no evidence, or applicable case law, to support his claim that the evidence was insufficient to support his conviction because the jury was instructed they could find him guilty of felony murder if they found he unlawfully possessed a firearm.

127.    There is no evidence to support [Petitioner]'s claim that appellate counsel should have argued that the evidence was insufficient to support [Petitioner]'s conviction.

---

[3]In Petitioner's supplement to his petition, he also asserts that appellate counsel was ineffective by not briefing the issue of the improper jury instruction on appeal. Pet'r's Suppl. 9, ECF No. 30. However, claims raised for the first time in a federal habeas petition are unexhausted.

128.    There is no credible evidence that appellate counsel's representation fell below an objective standard of reasonableness.

129.    There is no credible evidence that the outcome of the appellate proceeding would have been different but for the alleged misconduct by appellate counsel.

SHR 137–38, ECF No. 19-26 (record citations omitted).

Based on its factual findings, and applying the *Strickland* standard, the state habeas court adopted the following legal conclusions regarding the claims:

84.    An attorney is prohibited from raising claims on appeal that are not founded in the record.

85.    "[T]he record on direct appeal will generally 'not be sufficient to show that counsel's representation was so deficient as to meet the first part of the *Strickland* standard' as '[t]he reasonableness of counsel's choices often involves facts that do not appear in the appellate record.' Thus an application for writ of habeas corpus is the more appropriate vehicle to raise ineffective assistance of counsel claims."

86.    [Petitioner] has failed to prove that the record was sufficient to support his claim that trial counsel was ineffective for not making additional objections to the jury charge.

87.    "(b) A person commits an offense if he . . . (3) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual."

88.    [Petitioner] has failed to prove that firing an unlawfully possessed firearm is not an act committed in the court [sic] of, and in furtherance of, the offense of unlawful possession of a firearm.

89.    "(b) The use of force against another is not justified . . . (5) if the actor sought an explanation from or discussion with the other person concerning the actor's differences with the other person while the actor was: . . . (A) carrying a weapon in violation of Section 46.02."

90.    [Petitioner] has failed to prove that the record demonstrated that he was not carrying a weapon in violation of Section 46.02 of the Texas Penal Code.

21

91. [Petitioner] has failed to prove that appellate counsel should have argued that the evidence was insufficient to support Applicant's conviction.

92. A full inquiry into appellate counsel's strategy or tactics is not required because there is a plausible basis in strategy for the actions.

93. [Petitioner] has failed to prove that his appellate attorney's representation fell below an objective standard of reasonableness.

94. A party fails to carry his burden to prove ineffective assistance of counsel where the probability of a different result absent the alleged deficient conduct "sufficient to undermine confidence in the outcome" is not established.

95. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. *If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."*

96. [Petitioner] has failed to show that there is a reasonable likelihood that the outcome of the appellate proceeding would have been different had appellate counsel raised different issues on appeal.

97. [Petitioner] has failed to show that there is a reasonable likelihood that, but for the alleged acts of misconduct, the result of the appellate proceeding would have been different.

98. [Petitioner] has failed to prove that he received ineffective assistance of appellate counsel.

*Id.* at 148 (citations omitted).

Deferring to the state court's factual findings, the state habeas court's application of *Strickland* is not objectively unreasonable under the doubly-deferential standard. Appellate counsel is not required to raise every conceivable argument urged by his client on appeal, regardless of merit. *Smith v. Robbins,* 528 U.S. 259, 287–88 (2000). It is counsel's duty to choose among potential issues, according to his judgment as to their merits and the tactical approach taken. *Jones v. Barnes,*

22

463 U.S. 745, 749 (1983). Petitioner presents no potentially meritorious issues that appellate counsel could or should have included in his appellate brief. Generally, as a matter of state law, ineffective-assistance-of-trial-counsel claims are to be presented in post-conviction state habeas-corpus proceedings, where the record can be properly developed. *See Trevino v. Thaler,* 569 U.S. 413, 424 (2013) (quoting *Ex parte Torres,* 943 S.W.2d 469, 475 (Tex. Crim. App. 1997)); *Roberts v. State,* 220 S.W.3d 521, 533 (Tex. Crim. App. 2007); *Mitchell v. State,* 68 S.W.3d 640, 642 (Tex. Crim. App. 2002). Appellate counsel is not ineffective for failing to assert meritless claims or arguments. *See United States v. Wilkes,* 20 F.3d 651, 653 (5th Cir. 1994). Furthermore, improper jury instructions in state criminal trials generally do not provide a basis for federal habeas relief unless the error resulted in prejudice of constitutional magnitude. *Sullivan v. Blackburn,* 804 F.2d 885, 887 (5th Cir. 1986). A habeas petitioner must demonstrate that the error had a substantial and injurious effect or influence on the determination of the jury's verdict. *Brecht v. Abrahamson,* 507 U.S. 619, 627 (1993); *Mayabb v. Johnson,* 168 F.3d 863, 868 (5th Cir. 1999). Because the state courts rejected this claim, Petitioner cannot demonstrate jury-charge error as a matter of state law. Nor does he cite to Supreme Court precedent that the instruction is constitutionally prohibited or present persuasive argument that, even if wrong, the instruction had a substantial and injurious effect or influence on the jury's verdict. And, assuming the jury did not find Petitioner's testimony that he shot Fobbs in self-defense credible and that he was illegally in possession of a gun at the time, a sufficiency-of-the-evidence claim on the matter would have been unsuccessful as well.

### D.  Prosecutorial Misconduct

Under his fourth ground, Petitioner claims that the prosecution engaged in misconduct because it knew that Amanda Schaffner of the Fort Worth crime lab suppressed evidence that Fobbs

23

had gunshot residue on his hands; leveraged evidence seized at the scene to coerce eyewitnesses to testify falsely; allowed vital evidence, Petitioner's cell phone, to be destroyed; and referred to Petitioner as a rapist during closing argument in the punishment phase of trial. Pet. 7, ECF No. 1. Under his fifth ground, Petitioner claims that the Fort Worth police department committed "police misconduct" because it (all spelling, grammatical, and/or punctuation errors are in the original)

> intentionally destroyed the phone seized from [Petitioner], in order to suppress and deny [Petitioner] the opportunity to inspect or use favorable evidence such critical evidence would have been able to assist [Petitioner] rebut the States case-in-chief in regards to who [Petitioner] spoke to, when any calls took place etc.

*Id.* at 11 (record citation omitted).

The state habeas court adopted the following relevant findings of fact regarding the claims:

5.      [Petitioner] presents no evidence to support his claim that one or more witnesses testified falsely.

6.      [Petitioner] presents no evidence, or authority, to support his claim that the fact that witnesses testified inconsistently was evidence they were committing perjury.

7.      [Petitioner] presents no evidence to support his claim that the State coerced witnesses to testify falsely.

8.      [Petitioner] presents no evidence to support his claim that the State used leverage against its witnesses to get them to testify falsely.

9.      [Petitioner] presents no evidence to support his claim that the State intentionally and knowingly used false and fabricated testimony.

10.     [Petitioner] presents no evidence that the State unintentionally used false and fabricated testimony.

11.     Fort Worth Police Detective Green testified that the victim's right hand testified positive for gunshot residue.

12.     Ms. Vickie Hall of the Trace Evidence Section from the Tarrant County Medical Examiner's Office testified that the samples taken from the victim's

24

right hand tested positive for gunshot residue.

13. The fact that the victim's right hand testified positive for gunshot residue was presented to the jury.

14. An Amanda Schaffner did not testify at [Petitioner]'s trial.

15. There is no evidence that Amanda Schaffner suppressed any evidence in this case.

16. [Petitioner] presents not [sic] evidence to support his claim that his conviction was the result of false evidence.

17. [Petitioner] presents no evidence to support his claim that the State intentionally presented false evidence.

18. [Petitioner] presents no evidence that the State unintentionally presented false evidence.

. . .

21. On December 1, 2016, the State learned that [Petitioner]'s cellphone was destroyed on April 23, 2016 by a Fort Worth Crime Lab employee, Jared Lynch, in accordance with then-existing Fort Worth Crime Lab protocols.

22. On December 2, 2016, the State notified defense of the destruction of [Petitioner]'s cellphone through the Tarrant County Criminal District Attorney's Office paperless file system, TSP.

23. On December 5, 2016, the State filed a State's Disclosure informing the trial court of the destruction of [Petitioner]'s cellphone.

24. [Petitioner] does not present any specific facts, or evidence, as to what he would have discovered had he been allowed to "test the validity" of the evidence obtained from his cellphone.

25. [Petitioner] does not explain why he could not have obtained records of who he spoke to on his own cellphone on the day of the offense from his cellphone provider.

26. [Petitioner] does not explain, or present any evidence, how another forensic analysis of his phone would include what his conversations were about.

27.    [Petitioner] does not explain, or present any evidence, how another forensic analysis would have included "what was said between [Petitioner] and those he called and those who called him."

28.    [Petitioner] presents no evidence, or specific facts, that he was harmed or prejudiced by the destruction of his cellphone.

29.    [Petitioner] presents no evidence to support his claim that an "unauthorized person[n]el" had access to his phone.

30.    [Petitioner] presents no evidence to support his claim that the employee who destroyed his phone in accordance with then-existing protocols was "fired."

31.    Jared Lynch "voluntarily left employment with Fort Worth Police Department."

32.    Testimony at trial demonstrated that [Petitioner]'s LG cellphone's web history included searching the internet for the "shooting on San Rafael Street in Fort Worth" less than two weeks after the incident.

33.    Testimony a [sic] trial demonstrated that [Petitioner]'s LG cellphone's web history regarding the shooting had been deleted by a user.

34.    [Petitioner] does not allege that his phone's deleted web history did not include searches about the shooting.

35.    Testimony at trial demonstrated that [Petitioner]'s LG cellphone's web history included visits to the Greyhound bus website less than two weeks after the shooting.

36.    [Petitioner] does not allege that his phone's web history did not include visits to the Greyhound bus website.

37.    Testimony at trial demonstrated that [Petitioner]'s LG cellphone web history included a search less than two weeks after the shooting for the weather forecast for Detroit, Michigan.

38.    [Petitioner] does not allege that his phone's web history did not include an inquiry regarding the weather in Detroit, Michigan.

39.    [Petitioner] was arrested in Detroit, Michigan, on July 23, 2015 (less than two weeks after the shooting), at the home of Ms. Veronica Wyatt.

26

40.  Ms. Wyatt testified that [Petitioner] contacted her and asked that she pick him from the Greyhound bus station in Detroit.

41.  A yellow bag was seized from Ms. Wyatt's home in Detroit, Michigan, when [Petitioner] was arrested.

42.  [Petitioner]'s Texas identification card was located inside the yellow bag.

43.  A Greyhound boarding pass and reboarding pass for [Petitioner] were found in a pair of pants that were inside the yellow bag.

44.  The Greyhound boarding and reboarding passes were for a trip from Dallas, Texas (through Memphis, Tennessee and Cincinnati, Ohio) to Detroit, Michigan.

45.  Testimony and evidence at trial demonstrated that a video recording of [Petitioner] was retrieved from [Petitioner]'s LG cellphone created prior to the shooting.

46.  [Petitioner] does not allege that the video recording of himself was not on his LG cellphone.

47.  The video of [Petitioner] showed him with a 9-millimeter firearm and money.

48.  When [Petitioner] was arrested in Detroit, Michigan, a 9-millimeter firearm was located next to his yellow bag.

49.  The 9-millimeter firearm collected in Detroit, Michigan, when [Petitioner] was arrested was at least partially loaded, with a round in the chamber.

50.  Three 9-millimeter casings were collected from the crime scene.

51.  Bullet fragments were collected from the victim's body.

52.  Ballistic tests confirmed that the 9-millimeter firearm collected near [Petitioner]'s yellow bag in Detroit, Michigan, when [Petitioner] was arrested there, was the same firearm that fired the 9-millimeter casings collected from the crime scene.

53.  The bullet fragments could not be compared to the firearm as they did "not directly interact with the barrel of the firearm."

54.  There is no evidence that [Petitioner]'s cellphone included more than

27

"potentially useful evidence."

55.    There is no evidence that the State acted in bad faith in destroying the evidence.

. . .

57.    On February 15, 2012, [Petitioner] was charged with sexually assaulting J.C., on or around February 1 2012, by forcing her to engage in sexual intercourse with him by the use of physical force or violence or the threat of force or violence.

58.    On November 8, 2013, [Petitioner] pled guilty to the offense of assault causing bodily injury of J.C., a family/household member, enhanced by a prior conviction.

59.    During closing argument at punishment, the State argued as follows:

> In 2012, you guys can take this back with you and look. This was originally a sexual assault case, because he forced [J.C.] - - by use of force, he forced her physically to have sex with him. He raped her. That's what he did. That's who he is. And he didn't stop there because he wasn't done. And he continued this behavior all the way up until July 2015.
>
> . . .
>
> Do you think you were going to have to hear about somebody that rapes women?

60.    The State did not refer to [Petitioner] as "a rapist."

61.    The State's comments that [Petitioner] raped J.C. was a summation of the evidence.

62.    [Petitioner] presents no credible evidence to support his claim that the State committed prosecutorial misconduct.

63.    [Petitioner] presents no credible evidence to support his claim that law enforcement committed police misconduct.

SHR 125–30, ECF No. 19-26 (record citations omitted).

Based on its factual findings, the state habeas court adopted the following legal conclusions:

6.      [Petitioner] has failed to present any evidence that the State's witnesses fabricated their testimony or committed perjury.

        . . .

15.     A prosecutor has an affirmative duty to disclose favorable evidence that is material either to guilt or punishment.

16.     "Under its present incarnation, to succeed in showing a *Brady* violation, an individual must show that (1) the evidence is favorable to the accused because it is exculpatory or impeaching; (2) the evidence was suppressed by the government or persons acting on the government's behalf, either inadvertently or willfully; and (3) the suppression of the evidence resulted in prejudice (i.e., materiality). Evidence is material to guilt or punishment 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' 'A "reasonable probability" is a probability sufficient to undermine confidence in the outcome."

17.     Evidence that gunshot residue was found on the victim's right hand was properly presented at trial.

18.     [Petitioner] has failed to prove that the State suppressed gunshot residue evidence.

19.     The State may not obtain a conviction through the use of perjured or false testimony.

20.     Knowingly using perjured or false testimony amounts to prosecutorial misconduct.

21.     Unknowing use of perjury or false evidence is considered a due process violation.

22.     Inconsistent testimony goes to the credibility of the State's witnesses and does not establish the use of perjured or false testimony.

23.     "Sworn pleadings provide an inadequate basis upon which to grant relief in habeas actions."

24.     [Petitioner] has failed to prove that the State improperly coerced eyewitnesses

to testify falsely.

25.     [Petitioner] has failed to prove that the State used perjured testimony.

26.     If the State fails to preserve "potentially useful evidence," the defendant must show that the State acted in bad faith in destroying the evidence.

27.     [Petitioner] has failed to prove that his cellphone contained more than "potentially useful evidence."

28.     [Petitioner] has failed to prove that the State acted in bad faith when his cellphone was destroyed in accordance with then existing protocols.

29.     To be proper, jury argument must fall under one of the following areas (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument of opposing counsel, and (4) plea for law enforcement.

30.     The State's closing argument regarding [Petitioner]'s prior offense was proper because it was a summation of the evidence.

31.     [Petitioner] has failed to prove that the State committed prosecutorial misconduct.

        . . .

34.     [Petitioner] has failed to prove that law enforcement committed police misconduct.

*Id.* at 139–41 (citations omitted).

Deferring to the state court's factual findings, the state habeas court's adjudication of the claims is not contrary to or an unreasonable application of federal law. Alleged prosecutorial misconduct during a state criminal trial is reviewed to determine whether it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974). Improper conduct by a state prosecutor is not of constitutional magnitude and will not warrant federal habeas corpus relief unless the conduct is so prejudicial that it rendered the trial fundamentally unfair within the meaning of the Due Process Clause. *See Darden v.*

*Wainwright,* 477 U.S. 168, 180–81 (1986); *Dowthitt v. Johnson,* 230 F.3d 733, 755 (5th Cir. 2000); *Barrientes v. Johnson,* 221 F.3d 741, 753 (5th Cir. 2000). "'A trial is fundamentally unfair if there is a reasonable probability that the verdict might have been different had the trial been properly conducted.'" *Id.* at 753 (quoting *Foy v. Donnelly,* 959 F.2d 1307, 1317 (5th Cir. 1992)). As the Fifth Circuit has noted, "'[a] prosecutor's improper [conduct] will, in itself, exceed constitutional limitations in only the most egregious cases.'" *Ortega v. McCotter,* 808 F.2d 406, 410–11 (quoting *Menzies v. Procunier,* 743 F.2d 281, 288–89 (5th Cir. 1984)).

Here, the actions taken and arguments presented by the prosecution were not improper, nor did they infect the entire trial with such unfairness that Petitioner was denied due process. Deferring to the state courts' factual findings, Petitioner's claims of misconduct are either conclusory, factually inaccurate, or non-prejudicial.

In order to prevail on a claim that his constitutional rights were violated by the presentation of false testimony, a petitioner must establish that: (1) the testimony was actually false; (2) the prosecution knew it was false; and (3) it was material. *Napue v. Illinois,* 360 U.S. 264, 271 (1959). As noted by the state court, mere inconsistencies in witnesses' testimony at trial are to be resolved by the jury and do not suffice to establish perjury. *Koch v. Puckett,* 907 F.2d 524, 531 (5th Cir. 1990); *United States v. Martinez-Mercado,* 888 F.2d 1484, 1492 (5th Cir. 1989).

Furthermore, Petitioner's cell phone was destroyed according to the Fort Worth Police Department's policies and procedures and not in order to mask any prosecutorial or police misconduct. Additionally, Petitioner failed to show that his cell phone contained any exculpable evidence or evidence that was in support of his defense. It is well settled that absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue, unsupported

or unsupportable by anything else contained in the record, to be of probative evidentiary value. *Ross v. Estelle,* 694 F.2d 1008, 1011 (5th Cir. 1983).

Finally, to establish that a prosecutor's remarks are so inflammatory as to render a state trial fundamentally unfair within the meaning of the Due Process Clause, a petitioner must demonstrate the misconduct was persistent and pronounced or that the evidence of guilt was so insubstantial the conviction would not have occurred but for the improper remarks. *Harris v. Cockrell,* 313 F.3d 238, 245 (5th Cir. 2002); *Turner v. Johnson,* 106 F.3d 1178, 1188 (5th Cir. 1997). As found by the state court, the prosecutor's allegedly objectionable remarks were a fair summation of the evidence before the jury. Moreover, there was overwhelming evidence favoring the prosecution on the matter of punishment, including Petitioner's attempt to flee and his history of violent behavior. The prosecutor's passing remark that he "rapes women" did not render his trial fundamentally unfair.

## VI.  CONCLUSION

For the reasons discussed, Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED**. A certificate of appealability is also **DENIED**.

**SO ORDERED** on this 30th day of December, 2021.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**